No. 15-35509

In the

# United States Court Of Appeals

For the

# Ninth Circuit

_____

JACOBUS RENTMEESTER,

*Plaintiff-Appellant*,

v.

NIKE, INC.,

*Defendant-Appellee.*

_____

Appeal from a Final Judgment of the United States District Court
for the District of Oregon in *Rentmeester v. Nike, Inc.*,
D.C. No. 3:15-cv-00113-MO

## APPELLANT'S OPENING BRIEF

Eric B. Fastiff
Dean M. Harvey
Katherine C. Lubin
LIEFF, CABRASER, HEIMANN &
 BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
(415) 956-1000

Cody Hoesly
LARKINS VACURA LLP
121 S.W. Morrison St., Ste. 700
Portland, OR 97204
(503) 222-4424

*Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................1

JURISDICTIONAL STATEMENT ........................................3

ISSUES PRESENTED..........................................................4

STATEMENT OF FACTS .....................................................5

     A.    Mr. Rentmeester Is A Renowned Photographer
           Recognized For His Artistry and Creativity ............................5

     B.    Mr. Rentmeester Creates A Stunning Portrait Of Mr.
           Jordan For *LIFE Magazine* .......................................8

     C.    Nike's Creative Director Sees The Rentmeester Photo In
           *LIFE Magazine* And Obtains Color Transparencies Of
           The Original Film....................................................10

     D.    Nike Violates Its Limited License With Mr. Rentmeester
           And Uses The Transparencies To Create An
           Unauthorized Derivative Work: The Nike Photo ...................11

     E.    Mr. Rentmeester Complains To Nike And Nike Agrees
           To A Second Limited License Allowing Two Years Of
           Further Use For Billboards and Posters Only........................12

     F.    Nike Violates Both Licenses And Creates Another
           Unauthorized Derivative Work: The Jumpman Logo .............13

     G.    District Court Proceedings.......................................13

SUMMARY OF THE ARGUMENT .....................................18

STANDARD OF REVIEW ..................................................19

ARGUMENT ...................................................................19

    I.    STANDARDS FOR ALLEGING COPYRIGHT
        INFRINGEMENT ....................................................19

    II.    THE DISTRICT COURT INCORRECTLY FOUND THAT
        THE RENTMEESTER PHOTOGRAPH IS ENTITLED TO
        ONLY THIN COPYRIGHT PROTECTION .....................22

     A.    The Rentmeester Photo Is Original Artistic Expression
           And Entitled To At Least Standard Protection ......................22

- i -

## TABLE OF CONTENTS
### (continued)

Page

B.   The District Court Erroneously Formulated, And Incorrectly Applied, An Idea-Expression Distinction ............25

C.   The Rentmeester Photo Reflects Creative Artistic Decisions Made From A Wide Range of Alternatives ...........35

III.   THE DISTRICT COURT WRONGLY FILTERED OUT PROTECTED ELEMENTS OF THE RENTMEESTER PHOTO AND FAILED TO RECOGNIZE THE SUBSTANTIAL SIMILARITIES WITH NIKE'S WORKS ...........44

A.   Nike Copied The Subject Matter .............46

B.   Nike Copied Mr. Rentmeester's Jordan Pose ..........47

C.   Nike Copied The Silhouette Of Mr. Jordan's Figure ..............50

D.   Nike Also Captured Mr. Jordan's Full Figure At The Apex Of His Vertical Leap .......................51

E.   Nike Copied The Outdoor Location With No Indication Of Basketball Apart From An Isolated Hoop, Backboard, and Pole.....................52

F.   Nike Copied The Perspective And Location Of The Viewer Vis-À-Vis Mr. Jordan.................54

G.   Nike Copied The Deep Depth Of Field ...................57

H.   Nike Copied The Creative Placement And Arrangement Of The Expressive Elements....................58

I.   The Nike Photo and Jumpman Logo Are Substantially Similar To The Rentmeester Photo...........................60

IV.   THE DISTRICT COURT ERRED BY IGNORING ALLEGED DIRECT EVIDENCE OF NIKE'S COPYING ................................61

V.   THE DISMISSAL OF MR. RENTMEESTER'S CLAIM UNDER THE DIGITAL MILLENIUM COPYRIGHT ACT SHOULD BE REVERSED................................66

VI.   THE DISTRICT COURT ERRED IN DISMISSING MR. RENTMEESTER'S COMPLAINT WITHOUT LEAVE TO AMEND ............................................67

- ii -

## TABLE OF CONTENTS
### (continued)

**Page**

CONCLUSION ....................................................................................68

CERTIFICATE OF COMPLIANCE.....................................................70

STATEMENT OF RELATED CASES ..................................................71

CERTIFICATE OF SERVICE .............................................................72

1274833.1

# TABLE OF AUTHORITIES

**Page**

## CASES

*Apple Computer, Inc. v. Microsoft Corp.*,
  35 F.3d 1435 (9th Cir. 1994)............................................................................... passim

*Ass'n for Los Angeles Deputy Sheriffs v. County of Los Angeles*,
  648 F.3d 986 (9th Cir. 2011).......................................................................... 19, 56

*Baxter v. MCA, Inc.*,
  812 F.2d 421 (9th Cir. 1987).......................................................................... 49, 53

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................ 63, 68

*Benay v. Warner Bros. Entm't, Inc.*,
  607 F.3d 620 (9th Cir. 2010)..................................................................................65

*Burrow-Giles Lithographic Co. v. Sarony*,
  111 U.S. 53 (1884) ......................................................................................... 47, 52

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002)......................................................................... passim

*Cmty. House, Inc. v. City of Boise, Idaho*,
  623 F.3d 945 (9th Cir. 2010)..................................................................................34

*Cook v. Brewer*,
  637 F.3d 1002 (9th Cir. 2011) ...............................................................................19

*Curtis v. General Dynamics Corp.*,
  Case No. C89-566S, 1990 WL 302725 (W.D. Wash. Sept. 26, 1990)...............36

*Eminence Capital, LLC v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ...............................................................................67

*Engineering Dynamics, Inc. v. Structural Software, Inc.*,
  26 F.3d 1335 (5th Cir. 1994)..................................................................................23

*Enter. Mgmt. Ltd. v. Warrick*,
  717 F.3d 1112 (10th Cir. 2013) .............................................................................62

*Ets-Hokin v. Skyy Spirits*,
  323 F.3d 763 (9th Cir. 2003)......................................................................... 28, 56

*Ets-Hokin v. Skyy Spirits, Inc.*,
  225 F.3d 1068 (9th Cir. 2000) ...................................................................... passim

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991)...................................................................... 22, 27, 45, 59

# TABLE OF AUTHORITIES

Page

*Harper & Row, Publrs., Inc. v. Nation Enters.*,
471 U.S. 539 (1985) ............................................................27

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*,
790 F.3d 532 (4th Cir. 2015)..............................................62

*Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Indus. of So. Cal.*,
648 F.2d 1252 (9th Cir. 1981) ............................................67

*Jacobsen v. Deseret Book Co.*,
287 F.3d 936 (10th Cir. 2002) ............................................23

*JCW Investments, Inc. v. Novelty, Inc.*,
289 F. Supp. 2d 1023 (N.D. Ill. 2003)
*aff'd*, 482 F.3d 910 (7th Cir. 2007).....................................29

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
676 F.3d 841 (9th Cir. 2012),
*as amended on denial of reh'g and reh'g en banc* (June 13, 2012) ........... passim

*Leigh v. Warner Brothers*,
212 F.3d 1210 (11th Cir. 2000) ..........................................61

*Los Angeles News Service v. Tullo*,
973 F.2d 791 (9th Cir. 1992)..............................................50

*Mannion v. Coors Brewing Co.*,
04-cv-1187 (LAK) (S.D.N.Y. Nov. 20, 2007)....................30

*Mannion v. Coors Brewing Co.*,
377 F. Supp. 2d 444 (S.D.N.Y. 2005).............................. 29, 31, 32, 50

*Mattel, Inc v. MGA Entm't, Inc.*,
705 F.3d 1108 (9th Cir. 2013) ............................................34

*Mattel, Inc. v. MGA Entm't, Inc.*,
616 F.3d 904 (9th Cir. 2010).................................... passim

*McCulloch v. Albert E. Price, Inc.*,
823 F.2d 316 (9th Cir. 1987).................................... passim

*Metcalf v. Bochco*,
294 F.3d 1069 (9th Cir. 2002) .................................. 65, 66

*Midway Mfg. Co. v. Bandai-Am., Inc.*,
546 F. Supp. 125, 148 (D.N.J. 1982) ..................................29

*Norse v. Henry Holt & Co.*,
991 F.2d 563 (9th Cir. 1993)..............................................62

# TABLE OF AUTHORITIES

Page

*Omega S.A. v. Costco Wholesale Corp.*,
776 F.3d 692 (9th Cir. 2015).............................................................34

*Petrella v. MGM*,
134 S. Ct. 1962 (2014) ....................................................................14

*Range Road Music, Inc. v. East Coast Foods, Inc.*,
668 F.3d 1148 (9th Cir. 2012) ................................................. 62, 68

*Rogers v. Koons*,
960 F.2d 301 (2d Cir. 1992)...................................................... passim

*Roth Greeting Cards v. United Card Co.*,
429 F.2d 1106 (9th Cir. 1970) ..........................................................64

*Segrets, Inc. v. Gillman Knitwear Co.*,
207 F.3d 56 (1st Cir. 2000) ..............................................................63

*Shaw v. Lindheim*,
919 F.2d 1353 (9th Cir. 1990) ..........................................................65

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
81 F.2d 49 (2d Cir. 1936)..................................................................49

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*,
562 F.2d 1157 (9th Cir. 1977) ............................................. 25, 27, 28

*Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*,
689 F.3d 29 (1st Cir. 2012) ..............................................................62

*Steinberg v. Columbia Pictures Indus.*,
663 F. Supp. 706 (S.D.N.Y. 1987).....................................................64

*Swirsky v. Carey*,
376 F.3d 841 (9th Cir. 2004).......................................................65, 68

*Three Boys Music Corp. v. Bolton*,
212 F.3d 477 (9th Cir. 2000).......................................................20, 65

*Warren Pub., Inc. v. Microdos Data Corp.*,
115 F.3d 1509 (11th Cir. 1997)
(*en banc*), *cert. denied*, 522 U.S. 963 (1997).......................................22

## STATUTES

17 U.S.C. § 102(a)(5)......................................................................19

17 U.S.C. § 106(2) ..........................................................................20

28 U.S.C. § 1291 ..............................................................................4

1274833.1

# TABLE OF AUTHORITIES

Page

28 U.S.C. § 1331 ...................................................................3

28 U.S.C. § 1338 ...................................................................3

## TREATISES

4 Melvin B. Nimmer and David Nimmer, Nimmer on Copyright
    § 13.03 (Matthew Bender, Rev. Ed. 2014) ............................ 23, 29, 60

## OTHER AUTHORITIES

Gail Grant, Technical Manual and Dictionary of Classical Ballet
    (3d ed. 1982) ...........................................................................39

*Les Plus Grands Photographes de LIFE*
    (*LIFE* eds. 2009) ....................................................................24

*LIFE 70 Years of Extraordinary Photography*
    (*LIFE* eds. 2007) ....................................................................24

*LIFE 75 Years: The Very Best of LIFE*
    (*LIFE* eds. 2011) ....................................................................24

*LIFE Sixty Years: A 60th Anniversary Celebration, 1936-1996*
    (*LIFE* eds. 1996) ....................................................................24

*The Great LIFE Photographers*
    (*LIFE* eds. 2004) ....................................................................24

# **INTRODUCTION**

The image is iconic. Left arm outstretched, his hand gripping a basketball as the tip of a crown holds a jewel, a silhouetted Michael Jordan elegantly flies through the air against a contrasting solid background, in defiance of gravity, legs splayed at an unusual angle. Few images in sports better capture the thrill of witnessing an exceptional athletic feat, or have been more widely disseminated. Defendant-Appellee Nike, Inc. has used this image (the "Jumpman Logo") for decades to market and sell its products.

The Jumpman Logo, however, is an unauthorized derivative work: it copies the central creative elements of a photograph Plaintiff-Appellant Jacobus Rentmeester conceived, orchestrated, and created of Mr. Jordan for *LIFE Magazine*, first published in a 1984 special issue in advance of the Los Angeles Summer Olympics (the "Rentmeester Photo"). *See* 2-Excerpts of Record ("ER")-69. A detail of the Rentmeester Photo appears on the left side of the next page, with the Jumpman Logo on the right:



With discovery underway, Nike moved to dismiss Mr. Rentmeester's first and only complaint. 2-ER-103. The district court granted Nike's motion with prejudice, pointing to minor differences between the images and ignoring alleged direct evidence of Nike's copying. 1-ER-1-14. The district court did not accept Mr. Rentmeester's allegations as true and draw all reasonable inferences in his favor. *Id.* Instead, the district court disregarded those allegations and made inconsistent factual findings, without the benefit of any factual record or expert analysis.

Contrary to Mr. Rentmeester's allegations, the district court found that the Rentmeester Photo lacked creativity, because—according to the district court—the *only* alternative expressive choices were "ten to fifteen" different camera perspectives and a "handful" of different lighting arrangements. 1-ER-8. The district court disregarded alleged direct evidence of Nike's copying, treating as

-2-

irrelevant Mr. Rentmeester's allegation that Nike's creative director asked Mr. Rentmeester for color transparencies of the original photographic film, and promptly violated the terms of Nike's limited license by creating an unauthorized derivative work. 2-ER-76-77, 92. The district court also ignored the second license between the parties that limited Nike's use of its derivative work to posters and billboards, and only through 1987. 2-ER-78, 94. Then, despite the uncontroverted fact that the Rentmeester Photo is an original work of visual art, the district court found that it is entitled to only "thin" copyright protection and applied a heightened standard for showing substantial similarity: "virtual identity." 1-ER-9. The district court found that the *only* protected similarity between the images is "the fact that the photographers [sic] were taken from similar angles." 1-ER-13. This one similarity was insufficient in light of minor differences, and so the district court held that Mr. Rentmeester could not state a claim for copyright infringement, dismissing his initial complaint without leave to amend. *Id*.

The district court made numerous errors and should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338. On June 15, 2015, the district court dismissed Mr. Rentmeester's claims with prejudice and, on June 17, 2015, entered judgment. 1-ER-1, 15. Mr. Rentmeester

timely noticed this appeal on June 19, 2015.  2-ER-16.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED

Did the district court err by:

1.      Misusing the idea-expression dichotomy to deny copyright protection over the key creative elements expressed in the Rentmeester Photo?

2.      Finding at the pleading stage that the Rentmeester Photo lacked creativity, and that the only expressive choices available to Mr. Rentmeester or to Nike were "ten to fifteen" different camera perspectives and a "handful" of different lighting arrangements?

3.      Holding that the Rentmeester Photo is entitled to only thin protection, capable of excluding only virtually identical derivative works?

4.      Ignoring the substantial similarities between the Rentmeester Photo and Nike's unauthorized derivative works?

5.      Treating Nike's alleged prior access to the Rentmeester Photo, including alleged direct evidence of copying, as irrelevant?

6.      Dismissing Mr. Rentmeester's complaint with prejudice before giving him any opportunity to amend?

1274833.1

# STATEMENT OF FACTS

### A.     Mr. Rentmeester Is A Renowned Photographer Recognized For His Artistry and Creativity

Mr. Rentmeester competed as an oarsman for the Kingdom of the Netherlands in the 1960 Olympic Games.  2-ER-73.  He then moved to the United States and became a prominent photographer and photojournalist.  *Id.*  He was a staff photographer for *LIFE Magazine* from 1966 to 1972, and thereafter worked as a freelance photographer focusing on editorial and commercial photography.  *Id.*; 4-ER-587.  Mr. Rentmeester created some of the most memorable images of the twentieth century.  2-ER-73.  For example, Mr. Rentmeester covered the Vietnam War (where he was wounded by a sniper's shot to his hand).  *Id.*  His 1967 photograph of an American tank commander became the first color photograph to win the World Press Photo of the Year award, photojournalism's highest honor.  4-ER-719-720.



Mr. Rentmeester's photograph of the hostage crisis at the 1972 Munich

Olympics became the defining image of that event.  5-ER-915-916.



That same year, Mr. Rentmeester won first prize in the World Press Photo

Sports Category for the following photograph of Olympic swimmer Mark Spitz.  5-

ER-885-886.



Mr. Rentmeester's photographs were featured on the covers of major magazines at least sixty-seven times. 4-ER-631-633. For example:



4-ER-587. Mr. Rentmeester was also a successful commercial photographer, working with such clients as Exxon, IBM, Kodak, and Pfizer. 5-ER-937-938.

The former managing director of World Press Photo—the non-profit organization that holds the photojournalism contest—summarized Mr. Rentmeester's talents:

> What we see through Rentmeester's eye is surprising and stimulating. He is much admired for his ability to paint with light, for the way he frames his subject and the position he shoots from. He is a true aesthete with an enviable sense of perception which he uses to show us things that would otherwise escape our attention. …Wide views that give a feeling of space are interspersed with beautiful portraits that draw you into the story and awaken your curiosity.

4-ER-641.

-7-

### B.    Mr. Rentmeester Creates A Stunning Portrait Of Mr. Jordan For *LIFE Magazine*

When the Summer Olympics returned to the United States in 1984, *LIFE Magazine* turned to Mr. Rentmeester "to create [a] portfolio of those who represent our nation's best."  2-ER-73, 207-208.  *LIFE Magazine* published thirteen of Mr. Rentmeester's portraits in a 22-page feature.  *Id.*  Mr. Rentmeester's photo essay included a portrait of Michael Jordan, created when Mr. Jordan was a student at the University of North Carolina (the "Rentmeester Photo").  2-ER-73-75 76, 217-218.



The Rentmeester Photo is highly staged and manifests significant creativity and technical skill.  Over the initial objections of UNC staff, Mr. Rentmeester

1274833.1

insisted on an outdoor location, away from a basketball arena or even an outdoor basketball court. 2-ER-74. This allowed Mr. Rentmeester to depict an isolated Mr. Jordan surrounded by an expanse of clear sky. 2-ER-74-75. Mr. Rentmeester eliminated visual distractions, including by directing his assistants to borrow a lawnmower to cut the grass as low as possible. *Id.*

Mr. Rentmeester selected and arranged the other visual elements. 2-ER-74-75. Mr. Rentmeester omitted any indication of basketball aside from a hoop, backboard, and pole. *Id.* There was no basketball court, no screaming fans, no fence, and no other players. *Id.* Mr. Rentmeester selected the location for the basketball pole and directed his assistants where to dig the hole, erect the poll, and assemble the hoop and backboard. *Id. See also* Part III.E, *infra.*

Mr. Rentmeester posed Mr. Jordan in a specific and artificial way that was inspired by Mr. Rentmeester's experience a year earlier photographing Mikhail Baryshnikov and members of the American Ballet Theatre. 2-ER-73-74, 4-ER-590. While this unusual pose was a departure for the up-and-coming basketball star, it also creatively departed from ballet: Mr. Jordan could not appear to be performing a standard ballet leap. Such a photograph would be confusing, awkward, perhaps even comical. Instead, Mr. Rentmeester posed Mr. Jordan so as to trick the viewer into thinking that Mr. Jordan was performing a gravity-defying dunk. 2-ER-74-75. Mr. Rentmeester also asked Mr. Jordan to jump with his body

open and facing the camera, his left leg forward, and his left hand extended while holding the perched basketball. *Id.* The pose was not reflective of Mr. Jordan's natural jump or dunking style. *Id.* Among other things, Mr. Jordan normally dunked with his right hand. 2-ER-75. The unusual nature of the pose required Mr. Jordan to practice several times in response to Mr. Rentmeester's feedback and direction. *Id.*; *see also* Part III.B, *infra*.

There were many other creative components of the Rentmeester Photo: a sharp silhouette of Mr. Jordan's full figure against a contrasting solid background (2-ER-75; Part III.C, *infra*); Mr. Jordan's full figure at the apex of his vertical leap (2-ER-75; Part III.D, *infra*); a particular perspective and location of the camera vis-à-vis Mr. Jordan (2-ER-74-75; Part III.F, *infra*); a deep depth of field that rendered all visual elements in focus (2-ER-75; Part III.G, *infra*); and selection and arrangement of the visual elements (2-ER-75; Part III.H, *infra*).

## C. <u>Nike's Creative Director Sees The Rentmeester Photo In *LIFE Magazine* And Obtains Color Transparencies Of The Original Film</u>

At approximately the same time that *LIFE Magazine* published the Rentmeester Photo, Nike and Mr. Jordan entered into their well-known endorsement relationship. 2-ER-76. Nike searched for an image it would use to launch its marketing campaign, seeking an image that was creative, different, and that evoked the same themes that Nike wanted for its Jordan-endorsed products.

-10-

*Id.* Peter Moore, Nike's creative director, led the effort. 2-ER-76-77. Mr. Moore

found the image he was looking for in the Rentmeester Photo. *Id.* Mr. Moore

contacted Mr. Rentmeester and asked for color transparencies of the original film.

*Id.* Mr. Rentmeester agreed to lend them to Nike with the following conditions (2-

ER-76, 92):

```
2 color transparencies "Michael Jordan"
for slide presentation only, no layouts
or any other duplication.
```

### D. Nike Violates Its Limited License With Mr. Rentmeester And Uses The Transparencies To Create An Unauthorized Derivative Work: The Nike Photo

Nike's Mr. Moore promptly violated the limited license with Mr.

Rentmeester by giving the Rentmeester Photo to another photographer, instructing

him to create an unauthorized derivative work, this time with Mr. Jordan wearing

Nike shoes (the Rentmeester Photo shows Mr. Jordan in Converse shoes):[1]

---

[1] 2-ER-77. *See also* Declaration of Dean M. Harvey in Support of Motion for Judicial Notice ("Harvey Decl."), Exs. 7 & 8.

-11-



**E.** **Mr. Rentmeester Complains To Nike And Nike Agrees To A
Second Limited License Allowing Two Years Of Further Use For
Billboards and Posters Only**

Nike used the derivative photograph (the "Nike Photo") on posters and

billboards. 2-ER-78. Mr. Rentmeester saw the Nike Photo and complained to

Nike. *Id*. Nike conceded that the Nike Photo was an unauthorized derivative work

and entered into a second limited license with Mr. Rentmeester, permitting the

following limited use of the Nike Photo (2-ER-78, 94):

```
Usage of image "Michael Jordan" Poster and Billboard, 2 years
----,--for North America only.
(all other usage rights are reserved)
```

Nike ignored this license, reproducing the Nike Photo in a wide variety of

forms continuously through the present. 2-ER-78.

-12-

**F.    Nike Violates Both Licenses And Creates Another Unauthorized Derivative Work: The Jumpman Logo**

Nike again violated its licenses with Mr. Rentmeester by creating a second

unauthorized derivative work: the Jumpman Logo, which Mr. Moore created by

simply tracing the outline of Mr. Jordan in the Nike Photo and exaggerating the

silhouette aspect so critical to the Rentmeester Photo.  2-ER-78-79.  *See also*

Harvey Decl., Ex. 7.  The Rentmeester Photo, the Nike Photo, and the Jumpman

Logo are strikingly similar (2-ER-75, 77, 79):



**G.    District Court Proceedings**

On January 22, 2015, Mr. Rentmeester filed his complaint.[2]   2-ER-66.  Mr.

Rentmeester alleged that Nike infringed his copyright in the Rentmeester Photo by

---

[2] After Mr. Rentmeester's difficult experience with Nike in first complaining about
the infringing Nike Photo, Mr. Rentmeester concluded that he would not be able to
alter Nike's behavior further without litigation.  However, Mr. Rentmeester's
livelihood was commercial photography, and he did not want to put that at risk by
filing a copyright lawsuit against one of the world's most important advertisers.
Mr. Rentmeester felt he had no choice but to wait until after retiring from
photography to file this case.  His lawsuit seeks damages within the three-year
statute of limitations period (January 22, 2012 to the present).  *See Petrella v.*
*(Footnote continued on next page)*

-13-

creating and reproducing the Nike Photo and Jumpman Logo without his permission. *Id.* Mr. Rentmeester also brought claims against Nike for vicarious and contributory copyright infringement and for violations of the Digital Millennium Copyright Act ("DMCA"). *Id.* Discovery commenced in March 2015. 6-ER-1060.

Nike moved to dismiss and to stay discovery, arguing that Mr. Rentmeester "cannot claim copyright over the 'idea' of Mr. Jordan dunking a basketball."[3] 2-ER-133. On June 15, 2015, the district court granted Nike's motion with prejudice. 1-ER-1. On June 17, 2015, the district court entered judgment and denied the discovery motion as moot. 1-ER-15.

The district court relied on one case to govern its analysis: *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904 (9th Cir. 2010). 1-ER-4-7. The district court formulated and applied what it called the "*Mattel* Test," dismissing other authorities as "merely apply[ing] the standard set out in *Mattel*."[4] 1-ER-6-7. *Mattel* concerned sculpts for dolls, and concept sketches for those dolls. 616 F.3d

---

*MGM*, 134 S. Ct. 1962, 1970 (2014). Nike raised no statute of limitations or laches issue below. *See* 2-ER- ER-19-65, 103-152, 6-ER-1008-1047.

[3] Mr. Rentmeester asserts no such claim. Of the countless images of Michael Jordan that Nike and others have made and used, Mr. Rentmeester alleges that only two infringe his copyright: the Nike Photo and Jumpman Logo.

[4] In fact, the vast majority of the authorities briefed by the parties predate *Mattel*. Of the published decisions cited by the parties following *Mattel*, none reference it.

at 914-16.  Nike never referenced *Mattel* in its briefs.  2-ER-103-152, 1008-1047.

At the hearing, Nike's counsel argued that *Mattel* is inapt because it does not

concern photographs, and also said: "Frankly, I think it's very unclear what the

court honestly was talking about there, Your Honor, to be really honest with you.

That's -- I'm puzzled over that opinion."  2-ER-58:20-59:8.  The district court

nonetheless viewed it as the only relevant authority: "I can't just say that I don't

really get what *Mattel* is saying."  2-ER-59:21-22.

According to the district court's "*Mattel* Test," the first step is to determine

"what idea the creator of the work was trying to express when she created the

copyrighted work."  1-ER-7.  Without citation to any authority (and without

support in *Mattel*), the district court understood its task as delving into Mr.

Rentmeester's mind at the moment he created the photograph to determine what he

was "trying to express."  *Id*.  The district court narrowly defined the relevant

"idea" as "Michael Jordan in a gravity-defying dunk, in a pose inspired by ballet's

grand-jeté."  *Id*.

The district court placed the "goalposts" determining the scope of copyright

protection as follows: a "gazillion ways to express an idea" resulting in standard

copyright protection that bars substantially similar copying, versus "a few ways" to

express an idea that leaves only thin protection against virtually identical copying.

1-ER-9.  The district court's placement of the first goalpost at a "gazillion"

-15-

resulted from the following language in *Mattel*: "If there's a wide range of expression (*for example*, there are *gazillions* of ways to make an aliens-attack movie), the copyright protection is 'broad' and a work will infringe if it's 'substantially similar' to the copyrighted work." 1-ER-4 (emphasis added here, quoting *Mattel*, 616 F.3d at 913-14). The district court thus took a rhetorical flourish regarding an *example* of a subject with a "wide" range of expression and treated it as a substantive requirement. The district court based its conclusion that the Rentmeester Photo is entitled to only thin protection—i.e., capable of excluding only virtually identical copying—upon the (unsupported) finding that there are only a "few different ways" to express Mr. Rentmeester's "idea" by varying the "perspective and lighting." 1-ER-9.

The district court then filtered out the following expressive elements as unprotectable: "the basketball hoop, the basketball, a man jumping, Mr. Jordan's skin color, and his clothing." 1-ER-10. The district court rejected any protection over the ways in which Mr. Rentmeester selected and arranged the visual elements. 1-ER-10-11.

Next, the district court considered Mr. Jordan's pose that Mr. Rentmeester conceived, directed, and expressed. The district court began by ignoring the photograph's creativity: "whether Mr. Rentmeester's idea was or was not original has no legal significance." 1-ER-11. The district court agreed that the pose is

-16-

entitled to protection as an expressive element, and observed that "at first glance there are certainly similarities" between the pose expressed in the Rentmeester Photo and the Nike works. *Id*. Yet the district court did not explain what the similarities were or consider them. *Id*. Instead, the district court discarded any similarities because of asserted differences in the bends of Mr. Jordan's elbows and the angles formed by Mr. Jordan's spread legs. 1-ER-12. While the district court found that Mr. Jordan is expressed in the same "grand-jeté pose in each photograph" (1-ER-12), the district court did not count that copied expression as a relevant similarity.

The district court ignored over a dozen other sources of similarity that Mr. Rentmeester specifically enumerated. *See* 4-ER-613-619.

The district court concluded that the only similarity that qualified under an application of its "*Mattel* Test" was "the fact that the photographers [sic] were taken from similar angles." 1-ER-13. This one similarity was insufficient to overcome the differences between the photographs, so the district court found that "Mr. Rentmeester cannot satisfy the objective test for copyright infringement." *Id.*

The district court then turned to a brief comparison with the Jumpman Logo. The court found that the Rentmeester Photo and the Jumpman Logo express the same idea, and "the Jumpman Logo is nothing more than an expression of the [same] pose." 1-ER-13. Despite the fact that no expression occurs in the

-17-

Jumpman Logo aside from the copied idea, copied pose, and copied silhouette effect, the district court found the two images not virtually identical because of minor differences in the same pose. *Id*.

Finally, the district court dismissed the DMCA claim because it found no underlying copyright infringement. 1-ER-13.

## SUMMARY OF THE ARGUMENT

This Court should reverse. First, the district court improperly departed from the standard copyright infringement analysis and found that the Rentmeester Photo—an original, creative work of visual art—is entitled to only "thin" protection against "virtually identical" copying. 1-ER-9. There were many alternatives available to Mr. Rentmeester and to Nike, and the district court erred by finding otherwise. The Rentmeester Photo is entitled to no less than standard copyright protection against substantially similar copying. Part II, *infra*.

Second, the district court wrongly filtered out nearly all of the protected elements of the Rentmeester Photo and failed to recognize the substantial similarities between it and the two Nike works. The district court concluded that the *only* relevant similarity is "the fact that the photographers [sic] were taken from similar angles." 1-ER-13. In fact, all three works depict the same subject matter; use the same pose; apply the same silhouette effect; capture Mr. Jordan at the same moment in his vertical leap; depict an isolated Mr. Jordan; view Mr. Jordan from

-18-

the same perspective and location; use the same depth of field; and use the same arrangement of visual elements. There are clearly substantial similarities to support a copyright infringement claim. Part III, *infra*.

Third, the district court erred by ignoring the alleged direct evidence of Nike's copying. Far from being irrelevant to the infringement analysis, Mr. Rentmeester's compelling allegations regarding Nike's copying should either obviate the need for a substantial similarity analysis altogether, or lower the standard for it. *See* 2-ER-77-79. Either way, it was incorrect for the district court to ignore these allegations and apply a *heightened* standard for similarity. Part IV, *infra*.

## STANDARD OF REVIEW

The Court reviews an order granting a motion to dismiss de novo. *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011). The Court accepts all well-pled allegations as true, considers them as a whole, and draws all reasonable inferences in the plaintiff's favor. *Ass'n for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 991 (9th Cir. 2011).

## ARGUMENT

## I.   STANDARDS FOR ALLEGING COPYRIGHT INFRINGEMENT

The copyright statute protects photographs and other "pictorial works." *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074 n.3 (9th Cir. 2000) (*Skyy I*) (citing 17 U.S.C. § 102(a)(5)). The owner of a valid copyright "has the exclusive right to

-19-

do and to authorize . . . derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). It is undisputed that Mr. Rentmeester owns a valid copyright to the Rentmeester Photo. 2-ER-76, 119.

"To establish a successful copyright infringement claim, a plaintiff must show that he or she owns the copyright and that defendant copied protected elements of the work." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). Copying may be shown by direct evidence. *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 481 (9th Cir. 2000). Such evidence exists in this case, as discussed below. Part IV, *infra*. Absent direct evidence, "[c]opying may be shown by circumstantial evidence of access and substantial similarity of both the general ideas and expression between the copyrighted work and the allegedly infringing work." *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994).

"[S]ubstantial similarity is inextricably linked to the issue of access." *Three Boys Music*, 212 F.3d at 485. "In what is known as the inverse ratio rule," this Court requires "a lower standard of proof of substantial similarity when a high degree of access is shown." *Id.* (internal quotation omitted). Access here is also undisputed. 2-ER-76, 119.

The Ninth Circuit employs a two-part analysis to determine whether two works are substantially similar: (1) an intrinsic test; and (2) an extrinsic test.

-20-

*Cavalier*, 297 F.3d at 822. The intrinsic test "is a subjective comparison that focuses on whether the ordinary, reasonable audience would find the works substantially similar in the total concept and feel of the works." *Id.* (internal quotation marks omitted). The "subjective assessments of similarity in expression" required by that test "are best suited to the trier of fact[.]" *Id.* at 826. Nike does not raise any issue under the intrinsic test.[5] 2-ER-119.

The extrinsic test "is an objective comparison of specific expressive elements" that can be decided as a matter of law in appropriate cases. *Cavalier*, 297 F.3d at 822. However, resolving substantial similarity before trial—even at summary judgment—is "not highly favored." *L.A. Printex*, 676 F.3d at 848 (internal quotation marks omitted).

When applying the extrinsic test, "a court must filter out and disregard the non-protectable elements in making its substantial similarity determination." *Cavalier*, 297 F.3d at 823. But this does not mean that "infringement cannot be based on original selection and arrangement of unprotected elements." *Id.* at 826 (quoting *Apple*, 35 F.3d at 1446). "The precise factors evaluated for [other types of works] do not readily apply to art works. Rather, a court looks to the similarity

---

[5] In any case, this is an issue that "must go to the jury." *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 852 (9th Cir. 2012), *as amended on denial of reh'g and reh'g en banc* (June 13, 2012).

-21-

of the objective details in appearance." *Cavalier*, 297 F.3d at 826. *See also L.A. Printex*, 676 F.3d at 849 (same).

## II. THE DISTRICT COURT INCORRECTLY FOUND THAT THE RENTMEESTER PHOTOGRAPH IS ENTITLED TO ONLY THIN COPYRIGHT PROTECTION

### A. The Rentmeester Photo Is Original Artistic Expression And Entitled To At Least Standard Protection

The district court failed to recognize that the Rentmeester Photo is entitled to at least standard copyright protection because it is a creative and original work of visual art. Creativity "remains the touchstone of copyright protection today," and is "the very premise of copyright law." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 347 (1991). The scope of copyright protection should therefore reflect the "facts of originality, of intellectual production, of thought, and conception." *Id.* at 362. "A creative work is entitled to the most protection, followed by a derivative work, and finally by a compilation." *Warren Pub., Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1515 (11th Cir. 1997) (*en banc*), *cert. denied*, 522 U.S. 963 (1997).

In addition, artistic works receive broader protection than factual or functional works. "[C]opyright law considers factual works to be fundamentally different from more artistic works." *McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 321 (9th Cir. 1987) (emphasis in original; quotation omitted). *See also Apple*, 35 F.3d at 1444-45 (partly functional works receive less protection than "purely

-22-

artistic works"). "Works that are not factual receive much broader protection under the copyright laws because of the endless variations of expression available to the artist." *McCulloch*, 823 F.2d at 321. *See also Apple*, 35 F.3d at 1447 (same); *Cavalier*, 297 F.3d at 826 (applying standard, broad copyright protection to illustrations); *L.A. Printex*, 676 F.3d at 851 (finding "stylized fabric designs" to be entitled to broad copyright protection); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 944 (10th Cir. 2002) (plaintiff's work involved "more creative effort and original expression than the telephone directories at issue in *Feist* …. Therefore, [plaintiff] could prove substantial similarity with less similarity than we would require if the allegedly infringed work were a telephone directory."); *Engineering Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1348 (5th Cir. 1994) ("the law is more protective of highly original and highly expressive works than it is of functional and nonfiction works"); *Rogers v. Koons*, 960 F.2d 301, 307-08 (2d Cir. 1992) (black and white photo entitled to at least standard protection: "[s]ubstantial creative effort went into both the composition and production"); 4 Melvin B. Nimmer and David Nimmer, Nimmer on Copyright § 13.03[A][4] (Matthew Bender, Rev. Ed. 2014) (thin protection reserved for works that express only "scant creativity").

The Rentmeester Photo epitomizes creative artistic expression that receives the broadest copyright protection. "It is well recognized that photography is a

form of artistic expression, requiring numerous artistic judgments." *Skyy I*, 225 F.3d at 1073. There is no dispute that the Rentmeester Photo is an original creative work. 2-ER-74-75. It is no mere candid photograph, nor is it a photograph of a fixed object such as a bottle of vodka, or of a subject with limited creative potential such as a red bouncy ball on a blank canvas. It is not a photograph of a natural process. And it is not a photograph with a commonplace premise that can only be expressed one way. Rather, the Rentmeester Photo is a highly staged and choreographed representation of one of the most gifted athletes in history. 2-ER-74-75. The Rentmeester Photo's creativity is the reason why *LIFE Magazine* first published it in a full double-page spread, and it is the reason why *LIFE Magazine* continued to feature the Rentmeester Photo in its marquee publications celebrating the best photographs throughout the magazine's history.[6] The Rentmeester Photo's creativity is the reason why Nike's Mr. Moore wanted color transparencies of the original film. And it is the reason why Nike copied it.

---

[6] *See*, *e.g.*, *LIFE Sixty Years: A 60th Anniversary Celebration*, *1936-1996*, 146 (*LIFE* eds. 1996); *The Great LIFE Photographers*, 440 (*LIFE* eds. 2004); *LIFE 70 Years of Extraordinary Photography*, 193 (*LIFE* eds. 2007); *Les Plus Grands Photographes de LIFE*, 440 (*LIFE* eds. 2009); *LIFE 75 Years: The Very Best of LIFE*, 169 (*LIFE* eds. 2011).

-24-

**B.** **The District Court Erroneously Formulated, And Incorrectly Applied, An Idea-Expression Distinction**

According to the district court's "*Mattel* Test," "a court must first determine the breadth of copyright protection" and "must decide what idea is being expressed by the artist in the copyrighted work." 1-ER-5. This is incorrect, particularly in cases involving works of visual art. "Under our two-part test for copyright infringement, it is not necessary to determine the scope of copyright protection or to identify the idea behind the [copyrighted work]." *McCulloch*, 823 F.2d at 319. For visual art works, "a court looks to the similarity of the objective details in appearance." *Cavalier*, 297 F.3d at 826. *See also id.* ("Although we do not attempt here to provide an exhaustive list of relevant factors for evaluating art work, the subject matter, shapes, colors, materials, and arrangement of the representations may be considered in determining objective similarity in appearance."); *L.A. Printex*, 676 F.3d at 849 (same); *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977) ("Such criteria include the type of artwork involved, the materials used, the subject matter, and the setting for the subject.").

Thus the district court should have simply compared the "objective details in appearance" between the Rentmeester Photo and Nike's derivative works to determine substantially similarity. *Cavalier*, 297 F.3d at 826. If the district court determined there was unprotected expression in the Rentmeester Photo, the district

-25-

court should have addressed it by filtering it out (while making sure to include creative selection and arrangement of otherwise unprotectable elements), or by applying "the relevant limiting doctrines in the context of the particular medium involved, through the eyes of the ordinary consumer of that product." *Apple*, 35 F.3d at 1443.

Instead, the district court fashioned a different inquiry no party advanced: "What matters is what idea the creator of the work was trying to express when she created the copyrighted work." 1-ER-7. Without discovery, the district court then defined the "idea" Mr. Rentmeester "was trying to express when [he] created the [Rentmeester Photo]" as: "Michael Jordan in a gravity-defying dunk, in a pose inspired by ballet's grand-jeté." *Id.* The district court then gave Mr. Rentmeester virtually no protection over his expression of that "idea," after finding that the only possible variations were "ten to fifteen" different camera perspectives and a "handful" of different lighting arrangements. 1-ER-8.

In defining the "idea" of the Rentmeester Photo, the district court asked the wrong question. No district court can or should delve into Mr. Rentmeester's mind at the moment he created the photograph, and then define the "idea" by describing specific details of *how* Mr. Rentmeester "was trying" to creatively express himself, down to his source of inspiration.

-26-

The district court then ignored as an unprotectable "idea" everything Mr. Rentmeester "trie[d] to express" (1-ER-7) at the moment he "created the [Rentmeester Photo]" (*id*.). But creative expression does not become unprotectable if the artist plans it in advance, or if the artist succeeds in expressing what she tries to express. This is absurd. Creativity cannot be expressed without first occurring in the mind of the artist. Should the protectable scope of the Rentmeester Photo expand if it resulted from luck and ignorance, rather than careful planning, innovation, and skill? Of course not. The copyright laws promote and reward creativity, they do not punish it. *Feist*, 499 U.S. at 349-50 ("copyright assures authors the right to their original expression"); *Harper & Row, Publrs., Inc. v. Nation Enters.*, 471 U.S. 539, 558 (1985) ("[T]he Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas.").

The district court was attempting to use the idea-expression distinction as a limiting principle, varying the scope of copyright protection "with the extent expression differs from the idea." *Krofft*, 562 F.2d at 1168. But to determine "whether the expression of an idea differs from the idea itself," the "idea" must be defined no more narrowly than "a simple description of what the work is[.]" *Id.* at 1168 n.10. "If, in describing *how a work is expressed*, the description differs little

-27-

from a *simple* description of *what the work is*, then idea and expression coincide," and the copyright will receive either no or narrow protection. *McCulloch*, 823 F.2d at 320 (emphasis in original) (quoting *Krofft*, 562 F.2d at 1168). In other words, "[t]he idea and the expression will coincide when the expression provides *nothing* new or additional over the idea." *Krofft*, 562 F.2d at 1168 (emphasis added). For instance, "Michaelangelo's David is, as an idea, no more than a statute [sic] of a nude male." *Krofft*, 562 F.2d at 1168. But Michaelangelo's David is entitled to very broad protection because of the "complexity and artistry of the expression" added to the "banal" underlying idea. *Id.*

Since *Krofft*, this Court has consistently defined the "idea" for purposes of the idea-expression distinction as the "what" of the work rather than the "how," in simple and abstract terms, from the viewpoint of the ordinary viewer. In *Ets-Hokin v. Skyy Spirits*, 323 F.3d 763 (9th Cir. 2003) (*Skyy II*), the "idea" was simply a photograph of a Skyy bottle. 323 F.3d at 766. In *Apple*, the "basic ideas" at issue included "the idea of a graphical user interface," and "the idea of a desktop metaphor." 35 F.3d at 1443-4. In *Mattel*, the concept behind a doll sculpt was "small plastic dolls that resemble young females," and the idea behind the doll sketches was "complete young, hip fashion dolls with exaggerated features." 616 F.3d at 915-16. In *Cavalier*, the "basic concept" of a pair of visual art works was

-28-

"stars situated on clouds."  297 F.3d at 827.  In *L.A. Printex*, the subject matter was "stylized fabric designs."  676 F.3d at 851.

As many courts have recognized, defining the "idea" of creative expression must be done with care, because:

> a copyright defendant could always avoid liability merely by describing a plaintiff's work in great detail and then labeling that description the "idea" of plaintiff's work.  The "idea" of any work could always be defined in such detail that the description of the expression would add nothing to the "idea," thus allowing a defendant to engage in all but verbatim copying.  Such a ploy cannot be allowed.  As the *Krofft* court noted, the description of the work for the purpose of identifying its idea must be a simple one.

*Midway Mfg. Co. v. Bandai-Am., Inc.*, 546 F. Supp. 125, 148 (D.N.J. 1982).  *See also JCW Investments, Inc. v. Novelty, Inc.*, 289 F. Supp. 2d 1023, 1036 (N.D. Ill. 2003) (quoting same), *aff'd*, 482 F.3d 910 (7th Cir. 2007) (district court properly rejected defendant's attempt to "shoehorn too much into the 'idea'")[7]; 4 Nimmer on Copyright § 13.03, n.167 ("[I]t is important that the 'idea' be formulated on an abstract level.  Otherwise, the idea and its expression will necessarily be indistinguishable.").

The most thoughtful treatment of the idea-expression distinction in the context of photography is *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444 (S.D.N.Y. 2005).  *Mannion* is by far the most analogous case ever decided by a

---

[7] *Mattel* quotes *JCW Investments* approvingly.  616 F.3d at 916.

federal court. (The district court here ignored it.) *Mannion* addressed the

substantial similarity between plaintiff's original photograph of basketball star

Kevin Garnett published in *SLAM Magazine*, and a derivative photograph

defendant Coors created and reproduced on billboards. The court denied summary

judgment regarding an asserted lack of substantial similarity between the following

two images (6-ER-1003, 1005):[8]





Plaintiff                                                  Defendant

---

[8] The lower right image is a detail of the allegedly infringing billboard, which is
the top right image. After the court denied the motion for summary judgment,
plaintiff prevailed at trial. Judgment (Dkt. 95), *Mannion v. Coors Brewing Co.*,
04-cv-1187 (LAK) (S.D.N.Y. Nov. 20, 2007).

-30-

*Mannion* recognizes two issues. The first is the question of where to draw the line between idea and expression. The second is the relevance of the line once it is drawn, particularly in the context of visual art like photographs.

The idea-expression distinction first arose from comparing literary works, and the application in that context is straight-forward. *Mannion*, 377 F. Supp. 2d at 458. For example, two books may be about the idea of special relativity, but use different words to explain it. *Id.* Special relativity itself is an unprotected idea, but the words each author uses to explain that idea is protected expression. *Id.*

But in the "visual arts, the distinction breaks down. For one thing, it is impossible in most cases to speak of the particular 'idea' captured, embodied, or conveyed by a work of art because every observer will have a different interpretation." *Id.* "Furthermore, it is not clear that there is any real distinction between the idea of a work of art and its expression. An artist's idea, among other things, is to depict a particular subject in a particular way." *Id.* *See also Cavalier*, 297 F.3d at 826 ("The precise factors evaluated for literary works do not readily apply to art works.").

Where a court is concerned with the breadth of a copyright claim in a work of visual art, the proper recourse is to filter out elements of the artist's expression that lack any creativity. A court may not include creative expression in the "idea" of a work of art, find that the expressive elements are merely unprotectable

-31-

manifestations of that "idea," and conclude that the work of art should receive only thin protection. Misusing the idea-expression distinction in this way leads to precisely the "nonsensical" error made by the district court here: to find "one photograph being substantially similar to another in the rendition and creation of the subject but somehow not infringing because of a shared idea." *Mannion*, 377 F.Supp.2d at 461.

*Mannion* concludes that the idea-expression distinction in visual arts accomplishes nothing more than what a standard copyright infringement analysis already achieves: "whether two works are substantially similar with respect to their protected elements." *Id.* at 461. This is exactly the approach this Court takes in evaluating works of visual art. For example, in *Cavalier*, this Court reversed a grant of summary judgment regarding a purported lack of substantial similarity by comparing the "objective details in appearance," 297 F.3d at 826, of the following works of visual art (6-ER-967-969):

 

| Plaintiff | Defendant |

-32-




Plaintiff                                              Defendant

The district court's approach is also at odds with *Mattel*. By formulating a so-called "*Mattel* Test," 1-ER-7, the district court treated *Mattel* as though it announced a new test for substantial similarity, replacing everything that came before it. But *Mattel* did no such thing, nor did it purport to. Instead, *Mattel* applied traditional copyright principles to the works at hand, consistent with *Cavalier*, *L.A. Printex*, and decades of copyright jurisprudence.

*Mattel* began by identifying the "basic concept" of the works at issue, and then determined the degree to which the expressions were creative in light of the subject matter. 616 F.3d at 915. In defining the "basic concept," *Mattel* did not delve into the mind of the creator, or include elements of creative expression. Instead, the "basic concept" of the doll sculpts was to produce "small plastic dolls that resemble young females." *Id*. In determining the scope of protection, *Mattel* then compared the "basic concept" against the expression to determine the degree of creativity and to screen out unprotected elements. *Id*. The court found that the

-33-

expressions were unoriginal and were the obvious result of the subject matter: an "attractive, young, female fashion doll with exaggerated proportions[.]" *Id.* The expression at issue was narrow for another reason: the "highly constrained" requirements of young female dolls. The copyright owner did not attempt to do anything that departed from convention, such as including a "large nose" or a "potbelly instead of a narrow waist." *Id.* Hence, the doll sculpts were entitled to only thin protection. *Id.*

*Mattel* reached the opposite result with respect to the other works at issue, the doll sketches. In contrast to doll sculpts, "there's a wide range of expression for complete young, hip female fashion dolls with exaggerated features." *Id.* at 916. The doll sketches were thus entitled to standard, broad protection. *Id.*

This Court has cited to *Mattel* in a total of four reported opinions.[9] This Court has not recognized any new test articulated by *Mattel*, nor suggested that *Mattel* changed copyright law.

Indeed, after *Mattel*, this Court reversed a district court's grant of summary judgment for the defendant regarding a purported lack of substantially similar expression between two works of visual art: floral fabric designs. *L.A. Printex*,

---

[9] *Omega S.A. v. Costco Wholesale Corp.*, 776 F.3d 692, 698 (9th Cir. 2015); *Mattel, Inc v. MGA Entm't, Inc.*, 705 F.3d 1108, 1109 (9th Cir. 2013); *L.A. Printex*, 676 F.3d at 850, 851, 852 ; *Cmty. House, Inc. v. City of Boise, Idaho*, 623 F.3d 945, 967 (9th Cir. 2010).

676 F.3d 841. The Court relied on *Cavalier* to articulate the relevant procedure in assessing similarity of visual art: "we examine the similarities in their 'objective details in appearance,' including, but not limited to, 'the subject matter, shapes, colors, materials, and arrangement of the representations.'" *L.A. Printex*, 676 F.3d . at 849 (quoting *Cavalier*, 297 F.3d at 826). The Court identified the "subject matter" of the two works simply as "stylized fabric designs," and compared their objective details in appearance for similarity. *Id.* at 850-51. The Court referenced *Mattel* for the basic proposition that a wide range of expression *in the basic expressive category at issue* ("stylized fabric designs") resulted in standard, broad protection. *Id.* at 850.

The district court misapplied *Mattel* and instead devised an analysis that is a radical departure from this Court's copyright jurisprudence. It should be reversed.

## C. The Rentmeester Photo Reflects Creative Artistic Decisions Made From A Wide Range of Alternatives

Even if the Court applies an idea-expression test in addition to a substantial similarity inquiry, the scope of Mr. Rentmeester's copyright is only strengthened. The basic idea of Mr. Rentmeester's copyrighted work is an image of Michael Jordan. 2-ER-73. This is what *LIFE Magazine* asked Mr. Rentmeester to create, and there were no other constraints on Mr. Rentmeester's expression. *Id*. An artistic work like the Rentmeester Photo "receives broad protection because of the

endless variations of expression available to the artist." *Apple*, 35 F.3d at 1447 (citing *McCulloch*, 823 F.2d at 321).

Mr. Jordan is one of the most photographed individuals in history, and the Court need only run an internet image search for "Michael Jordan" to take judicial notice of the myriad poses, angles, lighting configurations, backgrounds, framings, shutter speeds, depths of field, additions of other graphic elements such as words and symbols, subsequent manipulations and stylizations such as "photoshopping," and so on, that are available to a photographer when creating an image of Mr. Jordan.

Mr. Jordan has been photographed countless times, for countless purposes, in countless ways. In the hands of an artist like Mr. Rentmeester, or a leading sports apparel corporation like Nike, the possibilities for expression were endless. The forms of artistic expression across Mr. Rentmeester's 13 photographs published in the same *LIFE Magazine* portfolio demonstrate the possibilities, as do the innumerable images of Mr. Jordan that Nike has seen fit to use for commercial purposes over the years. *See Curtis v. General Dynamics Corp.*, Case No. C89-566S, 1990 WL 302725, at *10 (W.D. Wash. Sept. 26, 1990) (other expressions of the same subject taken by defendant indicate the wide range of expression available to create a photograph for their advertisement, and demonstrate that the idea and expression involved in photographing a wheelchair do not merge).

-36-

However the Court defines the "idea" of the Rentmeester Photo, it is a particular creative expression among a great variety of alternative choices, and should accordingly receive no less than standard protection. In its motion to dismiss, Nike defined the "idea" of the Rentmeester Photo as "Mr. Jordan dunking a basketball." 2-ER-133. This concept is subject to endless possible expressions, such as the following images of Mr. Jordan performing actual dunks (Harvey Decl., Exs. 1 & 2):





-37-

Even if the Court adopts the narrow and improper "idea" the district court proposed, the Rentmeester Photo is a particular creative expression among a wide range of possible alternatives. According to the district court, the only alternatives available to Mr. Rentmeester or to Nike were "ten to fifteen" different placements of the camera and "only a handful" of different lighting choices. 1-ER-8. That conclusion, lacking any support in the complaint or the facts, is wrong.

Mr. Rentmeester drew inspiration from his own prior work a year earlier photographing Mikhail Baryshnikov and members of the American Ballet Theatre, including Robert LaFosse and Susan Jaffe (2-ER-74, 4-ER-590-591):



The next photograph, also by Mr. Rentmeester, shows Mr. LaFosse and Ms. Jaffe perfoming twin grand jetés (4-ER-591).

-38-



But Mr. Rentmeester did not photograph Mr. Jordan perfoming a "grand jete," or any other ballet leap. 2-ER-74. There are at least 45 recognized variations of the jeté, or leap.[10] None concern the sport of basketball or how to leap with a ball. Mr. Rentmeester created a different pose for Mr. Jordan, and included it with other elements of creative visual expression to trick the viewer into thinking that Mr. Jordan was in the middle of an elegant, gravity-defying dunk. 2-ER-74-75.

Mr. Jordan's figure in the Rentmeester Photo looks nothing like the figures of Mr. LaFosse or Ms. Jaffe in the photographs above. Mr. Jordan's arms do not cross his body, but are extended out and away. His legs do not form a straight line,

---

[10] *See generally* Gail Grant, *Technical Manual and Dictionary of Classical Ballet*, 63-69 (3d ed. 1982).

1274833.1

but rather a "V" shape. Mr. Jordan's head is not angled back across his body and toward the viewer, but directed forward at the basket and away from the viewer, further supporting the impression that he is soaring through the sky, preparing to dunk. 2-ER-74. The second image above of Mr. LaFosse and Ms. Jaffe also illustrates one of many alternative ways Mr. Rentmeester could have expressed movement: by panning the camera to blur the background, and by using a longer shutter speed with a shorter flash to create bluring around the jumping figures. The backgrounds are also different: the first has a brooding, dark, cloudy sky; the second is the interior of a ballet studio.

Just as there were many alternatives available to Mr. Rentmeester, so were many alternatives available to Nike, even applying the same "idea" as defined by the district court. Nike created many different images of Michael Jordan in gravity-defying poses that appear to be "inspired" by the "idea" of the Rentmeester Photo.

For instance, Nike photographed Mr. Jordan with the basketball in his right hand (his natural shooting hand), his arms level and outstretched in a straight line, his head and eyes directed in an angle nearer to the viewer, and his legs closer together, with his left knee extending directly downward from his torso. Nike included a variety of other visual elements and text, and added other individuals

-40-

(e.g., a surprised and diminutive Spike Lee, standing atop the earth).  For example

(Harvey Decl., Ex. 3):



Nike reversed the perspective of the viewer, placed the backetball hoop on

the left side of the image, placed the basketball underneath Mr. Jordan's right hand

and pushed down (rather than held up in an extension of his arm), had his left arm

cross his body along his waist with his fingers together, took the image at a

different moment in Mr. Jordan's jump, used a different backboard behind the

basket, and superimposed the text: "LOOK, UP IN THE AIR." (Harvey Decl., Ex. 4):



Nike created close-up shots of Mr. Jordan's feet with superimposed text: "WING IT." (Harvey Decl., Ex. 5):



Nike also removed Mr. Jordan entirely and replaced him with a fictional character (Harvey Decl., Ex. 6):



-43-

With respect to the Jumpman Logo, Nike again had an endless variety of creative choices. This is best illustrated by the logo Nike used before replacing it with the Jumpman Logo (2-ER-80):



There can be no question that there were a wide variety of alternative expressions available to Mr. Rentmeester and to Nike, regardless of how the Court defines the "idea" of the Rentmeester Photo.

## III.  THE DISTRICT COURT WRONGLY FILTERED OUT PROTECTED ELEMENTS OF THE RENTMEESTER PHOTO AND FAILED TO RECOGNIZE THE SUBSTANTIAL SIMILARITIES WITH NIKE'S WORKS

"[U]nprotectible elements should not be considered when applying the extrinsic test to art work." *Cavalier*, 297 F.3d at 825-26. "This does not mean that at the end of the day, when the works are considered under the intrinsic test, they should not be compared as a whole. Nor does it mean that infringement cannot be based on original selection and arrangement of unprotected elements. However, the unprotectable elements have to be identified, or filtered, before the works can be considered as a whole." *Id.* at 826 (quoting *Apple*, 35 F.3d at 1446). "The

-44-

precise factors evaluated for [other types of works] do not readily apply to art works.  Rather, a court looks to the objective details in appearance."  *Id.*

The district court filtered out the following elements as unprotectable: "the basketball hoop, the basketball, a man jumping, Mr. Jordan's skin color, and his clothing."  1-ER-10.  But the district court also found that the way Mr. Rentmeester selected and arranged these elements is unprotectable.  1-ER-10-11.  Here the district court erred, in light of the artistic creativity of the selection and arrangement, and the very low bar of creativity necessary to confer copyright protection.  "To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be.  Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying."  *Feist*, 499 U.S. at 345.  There is, at minimum, "some creative spark" to how Mr. Rentmeester selected and arranged these elements in the Rentmeester Photo.  The selection and arrangement are therefore protectable and should be considered when applying the extrinsic test.

Moreover, the district court ignored several other creative elements of the Rentmeester Photo, described below.  These creative elements were filtered out through omission with no analysis or justification.  In failing to consider these

-45-

elements, the district court failed to reference this Court's leading case regarding elements of protectable artistic expression in photography: *Skyy I*, 225 F.3d 1068. "Courts as well as photographers have recognized the artistic nature of photography. Indeed, the idea that photography is art deserving protection reflects a longstanding view of Anglo-American law." *Id.* at 1074. "Elements of originality in a photograph may include posing the subjects, lighting, angle, selection of film and camera, and almost any other variant involved." *Id.* at 1075 (quoting *Rogers*, 960 F.2d at 307). "Decisions rendering the photograph a protectable 'intellectual invention' include[]: the posing and arrangement of [the subject]; the selection and arrangement of background and accessories; the arrangement and disposition of light and shade; and the evocation of the desired expression." *Id.* at 1074-75. "[S]uch decisions by the photographer—or, more precisely, the elements of photographs that *result* from these decisions—are worthy of copyright protection." *Id.* at 1075.

### A.  <u>Nike Copied The Subject Matter</u>

However the Court defines the basic "idea," or subject matter, of the Rentmeester Photo, there is no dispute that it is identical to the basic "idea," or subject matter, of the Nike Photo and the Jumpman Logo. All three are images of Michael Jordan. All three images depict Michael Jordan appearing to dunk a basketball. And all three images show "Mr. Jordan in a gravity-defying dunk, in a

-46-

pose inspired by ballet's grand-jeté." 1-ER-7. The fact that the Rentmeester Photo, Nike Photo, and Jumpman Logo all express the same basic idea, concept, or subject matter is a relevant similarity under the extrinsic test. *See*, *e.g.*, *Cavalier*, 297 F.3d at 826-27 (in comparing several pairs of artwork, noting that each pair shared a common "basic idea," "basic concept," or "subject matter," and counting that as a relevant similarity in the objective details of appearance).

### B. Nike Copied Mr. Rentmeester's Jordan Pose

A critical expressive element of the Rentmeester Photo is the creative pose. The pose a photographer chooses for the subject has been protectable artistic expression for over a century. *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884); *Skyy I*, 225 F.3d at 1074-76.

Mr. Jordan's pose in the Rentmeester Photo has eight components. The first element is that it was performed by Mr. Jordan—a basketball star, not a ballet dancer. 2-ER-74-75. Second, Mr. Jordan leaped vertically (with no actual forward movement), to create as much height as possible. 2-ER-75, 80. Third, to create the illusion of forward movement, Mr. Jordan stuck his left foot forward and fully extended his leading left leg, and brought his right foot and leg back, forming a "V" shape with his legs. 2-ER-74-75. Fourth, Mr. Jordan grasped a basketball with his left hand, despite being right-handed, allowing Mr. Rentmeester to photograph Mr. Jordan from the front, with the basket to the right of Mr. Jordan's

-47-

figure, and expressing a fully extended form without an arm crossing in front of Mr. Jordan's face. *Id.* Fifth, Mr. Jordan triumphantly held the basketball in a particular way: as the tip of a crown holds a jewel, by stretching his left arm straight and in front of his body, and positioned his arm nearly vertically, with a slight angle forward. *Id.* Sixth, Mr. Jordan's right arm was away from his body and did not block the camera's view of his torso. *Id.* Seventh, Mr. Jordan unclenched his right hand and outstretched his fingers. *Id.* Eighth, Mr. Jordan positioned his head to face the basket, and stared directly at it, further leading the viewer to infer that he was on his way to making a dunk. *Id.*

The Nike Photo and the Jumpman Logo do not simply reproduce some or most of the components of the pose. They reproduce all eight. *See* 2-ER-77, 79. This was not a fortuitous coincidence. It was intentional copying of protected expression. The poses are not only substantially similar, they are virtually identical. The poses are also the central visual element of the three images. This is particularly true of the Jumpman Logo, as the district court recognized: "the Jumpman Logo is *nothing more than an expression of the pose*." 1-ER-13 (emphasis added).

Nonetheless, the district court found that the poses are not substantially similar because they are not "virtually identical." 1-ER-12. This was error. First, as explained above, the correct standard is substantial similarity, not virtual

-48-

identity. Part II, *supra*. Second, the district court impermissibly ignored the similarities because of minor differences in the bends of Mr. Jordan's elbows and slight differences in the positioning of Mr. Jordan's legs.[11] But "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *L.A. Printex*, 676 F.3d at 852 (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (Hand, J.)). A "copyright defendant need not copy a plaintiff's work in its entirety to infringe that work. It is enough that the defendant appropriated a substantial portion of the plaintiff's work." *Id. See also Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) ("Even if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity.")

The small differences in the poses the district court identified do not overcome the many similarities. Those similarities are qualitatively important and substantial.

---

[11] With respect to the position of Mr. Jordan's legs, the district court incorrectly found that Mr. Jordan's legs in the Rentmeester Photo nearly form a straight line, while Mr. Jordan's legs in the Nike Photo and Jumpman Logo form a "V" shape. 1-ER-12. In fact, the interior angle formed by Mr. Jordan's thighs in the Rentmeester Photo is approximately 138 degrees (far from the 180 degree interior angle of the ballet dancers performing a grand jeté in the second photograph of Mr. LaFosse and Ms. Jaffe, above). *See* 2-ER-75. The interior angle formed by Mr. Jordan's thighs in the Nike Photo and Jumpman Logo is nearly identical: 130 degrees, only an 8 degree difference from the Rentmeester Photo. *See* 2-ER-77, 79.

### C.     __Nike Copied The Silhouette Of Mr. Jordan's Figure__

The next expressive element of the Rentmeester Photo is a sharp silhouette of Mr. Jordan's full, soaring figure against a contrasting solid background (a cloudless sky). 2-ER-74-75. *See, e.g.*, *Los Angeles News Service v. Tullo*, 973 F.2d 791, 794 (9th Cir. 1992) (noting wide judicial recognition of "selection of … background [and] lighting . . . as protectible elements of a photographer's work"); *Mannion*, 377 F.Supp.2d at 450 n.37 (collecting cases).

Mr. Rentmeester used a fast shutter speed synchronized with a very powerful set of outdoor strobe lights (powered by a mobile generator) to capture a crisp image of Mr. Jordan's full, soaring form. 2-ER-75. This was 1984, before the era of automatic focus and computer-aided tools. Mr. Rentmeester had to set the focus of the lens manually, matching it precisely to the distance from the subject. To further set off Mr. Jordan's figure and create a silhouette effect, Mr. Rentmeester shot into the sun, creating natural ambient backlighting. 2-ER-75. The silhouette is further accentuated by the solid background of cloudless sky and by Mr. Jordan's dark clothing. *Id*.

Mr. Rentmeester selected the length of exposure by selecting a shutter speed from among many alternatives. 2-ER-75. *See Skyy I*, 225 F.3d at 1073 ("varying the length of exposure" is an artistic choice) (quotation omitted). For instance, the length of exposure could have been much longer to create a blurred form, an

-50-

alternative technique that would have conveyed movement but in a very different way (as Mr. Rentmeester did in the second photograph of Mr. LaFosse and Ms. Jaffe, above).  Instead, Mr. Rentmeester chose a very fast shutter speed to capture a crisp form of Mr. Jordan.  2-ER-75.

As with the pose, the silhouette aspect of the Rentmeester Photo is also copied in both the Nike Photo and the Jumpman Logo.  The Nike Photo duplicates the cloudless sky background, and reproduces the silhouette aspect by appearing to use a combination of a synchronized frontal strobe light with natural ambient backlighting (just as Mr. Rentmeester did).  *See* 2-ER-77.  The Jumpman Logo copies this expressive element and exaggerates it with a solid silhouette of the pose against a contrasting solid background.  2-ER-79.

### D. Nike Also Captured Mr. Jordan's Full Figure At The Apex Of His Vertical Leap

Another creative element of the Rentmeester Photo is the moment Mr. Rentmeester chose to capture Mr. Jordan's pose by pressing the shutter-release button.  This is another form of protectable artistic expression.  *See*, *e.g.*, *Skyy I*, 225 F.3d at 1073 (the photographer's "decision as to the exact, climatic [sic] instant of exposure" is an artistic judgment).

Mr. Rentmeester could have captured Mr. Jordan as he first leapt into the air, as Mr. Jordan came down from the top of his leap, or any moment in between.  Out of the various moments in time to capture Mr. Jordan's figure, Mr. Rentmeester

-51-

chose to expose the film at the apex of Mr. Jordan's vertical leap, when his limbs were the most outstretched and when he reached the maximum extent of his vertical height. 2-ER-75. Along with the pose, this moment of exposure creates the strong impression of a forward and upward trajectory.

Nike captured Mr. Jordan's pose at the same moment Mr. Rentmeester did. 2-ER-77.

### E. Nike Copied The Outdoor Location With No Indication Of Basketball Apart From An Isolated Hoop, Backboard, and Pole

The background and overall setting a photographer chooses for the subject is another protectable element. *Burrow-Giles*, 111 U.S. at 60; *Skyy I*, 225 F.3d at 1074; *Los Angeles News Serv.*, 973 F.2d at 794.

Again, Mr. Rentmeester eschewed convention and made a creative choice. He did not photograph Mr. Jordan on a basketball court, either indoor or outdoor. 2-ER-73-75. Instead, Mr. Rentmeester directed the setup of the hoop, backboard, and pole, and selected an outside location with no other indicia of basketball. *Id.* The image shows no basketball court, no arena, no walls, no fence, no other players, no referees, no fans, and no coach. 2-ER-75. There is nothing in the background but cloudless sky, and nothing in the foreground aside from the ground itself. *Id.*

Nike copied this expressive element, too. Nike brought Mr. Jordan to an outdoor location with no other indicia of basketball apart from an isolated hoop,

backboard, and pole. 2-ER-77. While the Nike Photo adds the skyline of Chicago,

and shows two poles for the backboard instead of one, these minor changes cannot

defeat the substantial similarity to every other important aspect of Mr.

Rentmeester's selection of the photograph's setting. *L.A. Printex*, 676 F.3d at 852

("But a copyright defendant need not copy a plaintiff's work in its entirety to

infringe that work. It is enough that the defendant appropriated a substantial

portion[.]"); *Baxter*, 812 F.2d at 425 (same); *Rogers*, 960 F.2d at 308 (same).

Nike selected a backboard and hoop that appear to be *exactly the same* as the

one Mr. Rentmeester purchased: the backboard is the same shape, color, and solid

opaque material; the hoop is identical; and the color, shape, and size of the square

behind the hoop is the same. *See* 2-ER-75, 77. Nike even placed the backboard in

substantially the same place relative to the camera as Mr. Rentmeester (detail of

Nike Photo on the left, Rentmeester Photo on the right), 2-ER-75, 77:



These similarities are neither fortuitous nor the result of the same obvious choice. Basketball backboards used by the NBA and NCAA at the time were transparent, not opaque; square-shaped, not with a curved top and curved bottom; with a white, not a red, square behind the basket; and with a contrasting painted border around the outside of the backboard itself. *See*, *e.g*., Harvey Decl., Exs. 1, 2 & 4. Nike used the Nike Photo to market its endorsement relationship with Mr. Jordan after he signed with the Bulls, an NBA team. 2-ER-78. Using an NBA backboard would have been the obvious choice (indeed, Nike used a backboard resembling those used by the NBA in the "LOOK, UP IN THE AIR" photo, above). Harvey Decl., Ex. 4. Instead, Nike copied every significant aspect of the setting of Mr. Jordan from the Rentmeester Photo, down even to the backboard and hoop choices. 2-ER-75, 77.

Even the minor differences between the Nike Photo and the Rentmeester Photo in this respect are entirely absent from the Jumpman Logo, which shows Mr. Jordan in the same pose, captured at the same moment, accentuating the same silhouette effect and the same isolation element. *See* 2-ER-75, 79.

## F. Nike Copied The Perspective And Location Of The Viewer Vis-À-Vis Mr. Jordan

Even with a "stationary subject," a photographer "can achieve an infinite number of varied compositions" by, among other choices, "varying the position of his camera" and "his camera angle[.]" *Skyy I*, 225 F.3d at 1074 (quotation

-54-

omitted).  The elements of the Rentmeester Photo that result from this decision receive copyright protection.  *Id.* at 1075.

In the Rentmeester Photo, the perspective and location of the viewer vis-à-vis Mr. Jordan has several specific components.  First, the viewer directly faces Mr. Jordan's sagittal plane, rather than facing Mr. Jordan's coronal or transverse planes.  2-ER-74, 75.  Second, the perspective is approximately 90 degrees off the trajectory of Mr. Jordan's illusory forward movement.  *Id.*  Third, the view of Mr. Jordan is sufficiently far away so that Mr. Jordan's full figure is framed by an expanse of a contrasting solid background, but also sufficiently close so that Mr. Jordan's figure is the dominate visual feature.  *Id.*  Fourth, the perspective is slightly below Mr. Jordan, with the camera angled upward, magnifying Mr. Jordan's vertical height and contributing to the sense of gravity-defiance and flight.  2-ER-75.

While the district court correctly acknowledged that the Rentmeester Photo and Nike photo were taken from "similar angles," 1-ER-13, the district court failed to recognize that the perspective and location of the viewer in the Rentmeester Photo have many specific components—not merely one angle—*all* of which are copied in both the Nike Photo and Jumpman Logo.  The district court also erred by finding, with no factual or expert basis, that there were only "ten to fifteen" "materially different perspectives" Mr. Rentmeester or Nike could have used.  1-

-55-

ER-8. These were not the "gazillion" alternatives required under the district court's "*Mattel* Test," and so the district court applied only thin copyright protection and required virtual identity. *See* 1-ER-9. Finally, after finding that the angle was virtually identical, the district court failed to find substantial similarity under the extrinsic test. *See* 1-ER-12. This analysis is mistaken and should be corrected.

First, this was improper fact-finding on a motion to dismiss, when Mr. Rentmeester's allegations must be construed in the light most favorable to him. *Los Angeles Deputy Sheriffs*, 648 F.3d at 991. If the district court found it necessary to determine the relevant number of different perspectives available, the district court should have made that finding from a factual record.

Second, even if there were only "ten to fifteen" different alternative perspectives and locations of the viewer in these images, 1-ER-8, this is a range of expression far beyond a single obvious choice required under application of the merger defense, *Skyy II*, 225 F.3d at 1082, and far beyond the "few" alternatives that might merit application of a virtually identical standard for substantial similarity, *Mattel*, 616 F.3d at 915 n.9. "Ten to fifteen" "materially different" choices, 1-ER-8, should result in standard copyright protection against copying the same choice made by the copyright owner.

-56-

Third, there were far more than "ten to fifteen," 1-ER-8, different alternatives. A very conservative estimate, varying only the specific elements of perspective described above, results in 192 materially different choices.[12] It is no coincidence that Nike copied the same combination as Mr. Rentmeester from among at least 192 different choices.

Fourth, after appearing to find that the perspectives employed are virtually identical, the district court should have found the extrinsic test satisfied. "[C]ourts have recognized repeatedly that the creative decisions involved in producing a photograph may render it sufficiently original to be copyrightable and have carefully delineated selection of subject, posture, background, lighting, and *perhaps even perspective alone* as protectable elements of a photographer's work." *Skyy I*, 225 F.3d at 1077 (emphasis added; quotation omitted).

Thus, the common perspective and location of the viewer in the works further supports a finding of substantial similarity.

## G.    Nike Copied The Deep Depth Of Field

The depth of field in a photograph is the distance within the image that appears in focus. When the depth of field is shallow, only a short range of distance

---

[12] (3 different anatomical planes) x (at least 8 significantly different perspectives to that plane) x (at least 8 significantly different distances from the subject along the same perspective) = no fewer than 192 materially different combinations of perspective and location.

within the image will be in focus while objects outside of that range will appear out of focus, such as a close-up image of an insect on a leaf in which the insect is in focus but the leaf is not. When the depth of field is deep, however, both the foreground and the background will appear in focus. A photographer varies the depth of field by choosing the lens, varying the aperture size (the F-stop number), and varying the focal distance. The depth of field in a photograph reflects a series of artistic judgments and is thus protectable. *Skyy I*, 225 F.3d at 1073-75.

The Rentmeester Photo relies on a deep depth of field. That is why it is not only the subject—Mr. Jordan—who appears in clear focus, but also every other visible element in the image, from the backboard to the blades of grass in the foreground, to the tops of the trees in the bottom right corner. 2-ER-75.

The Nike Photo copies this expressive element: every visual object in the Nike Photo, from Mr. Jordan to the background, is in clear focus. 2-ER-77. This effect results from a deep depth of field substantially similar to that contained in the Rentmeester Photo.

### H. Nike Copied The Creative Placement And Arrangement Of The Expressive Elements

While the district court properly acknowledged that the creative arrangement of even unprotectable elements will confer protection over the arrangement,1-ER-10 (citing *Cavalier*, 297 F.3d at 826), the district court incorrectly denied protection over Mr. Rentmeester's creative arrangement, 1-ER-10-11. As

-58-

explained above, the district court failed to acknowledge the extremely low level of creativity necessary to confer copyright protection: "the requisite level of creativity is extremely low; even a slight amount will suffice." *Feist*, 499 U.S. at 345. The creative arrangement of the visual elements here far exceed this test. *See id.* ("The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be.") (internal quotation omitted).

In addition to the arrangement of the elements discussed above, Mr. Rentmeester arranged the basketball hoop on the right side of the image, with Mr. Jordan to the left of it. 2-ER-74-75. This was a creative, non-obvious decision. Mr. Jordan is right-handed and typically dunks with his right hand. 2-ER-75. Thus the vast majority of photographs of Mr. Jordan dunking display the hoop on the left side of the image with Mr. Jordan on the right. *See*, *e.g.*, Harvey Decl., Exs. 1, 2 & 4. But Mr. Rentmeester instructed Mr. Jordan to use his left hand instead, which allowed Mr. Rentmeester to place the hoop on the right of Mr. Jordan in the Rentmeester Photo, and permitted Mr. Jordan's extended left arm to hold up the basketball without crossing in front of Mr. Jordan's face. 2-ER-74-75.

Nike copied these elements, as well. 2-ER-77. Nike did not even add text on top of the image, which was its common practice. *See*, *e.g.*, Harvey Decl., Exs.

2-5. The creative elements of the Rentmeester Photo that Nike copied conveyed these themes better than words ever could.

## I. The Nike Photo and Jumpman Logo Are Substantially Similar To The Rentmeester Photo

Contrary to the district court, the similarities among the works at issue go far beyond "the fact that the photographers [sic] were taken at similar angles," 1-ER-13. Nike copied the concept and subject matter. Nike copied all eight expressive elements of the pose. Nike copied the silhouette aspect of Mr. Jordan full form against a contrasting solid background. Nike captured Mr. Jordan at the same moment: the apex of his vertical leap. Nike copied the outdoor location, copied the backboard, and copied the lack of any indicia of basketball apart from an isolated hoop, backboard, and pole. Nike copied the same perspective and location of the viewer vis-à-vis Mr. Jordan. Nike used the same depth of field. Nike copied the placement and arrangement of the visual elements.

Nike clearly plagiarized Mr. Rentmeester's protected expression. There can be no doubt that these similarities are, at the very least, substantial. Nike cannot avoid liability by pointing to "small changes here and there." *Rogers*, 960 F.3d at 308. "'It is entirely immaterial that, in many respects, plaintiff's and defendant's works are dissimilar, if in other respects, similarity as to a substantial element of plaintiff's work can be shown.'" *L.A. Printex*, 676 F.3d at 851 (quoting 4 Nimmer on Copyright § 1303[B][1][a]); *see, e.g., Leigh v. Warner Brothers*, 212 F.3d 1210,

-60-

1216 (11th Cir. 2000) (reversing summary judgment for defendant with respect to its alleged infringement of a photograph notwithstanding "undeniably[] significant differences between the pictures."); *Rogers*, 960 F.2d at 308 (affirming summary judgment for the plaintiff regarding alleged infringement of a photograph: "Thus, where substantial similarity is found, small changes here and there made by the copier are unavailing. It is only where the points of dissimilarity exceed those that are similar and those similar are—when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate.").

The differences here do not come close to defeating the similarities, and the similarities concern substantial protected elements of the Rentmeester Photo.

## IV.   THE DISTRICT COURT ERRED BY IGNORING ALLEGED DIRECT EVIDENCE OF NIKE'S COPYING

Mr. Rentmeester's detailed allegations of Nike's copying and prior access to the Rentmeester Photo played no role in the district court's substantial similarity analysis. The district court thereby erred and lost sight of the purpose of the exercise: to determine whether Mr. Rentmeester adequately alleged that Nike copied the Rentmeester Photo.

First, Mr. Rentmeester alleges direct evidence of Nike's copying. 2-ER-76-79. Direct evidence of copying obviates the need for a substantial similarity inquiry. "A showing of substantial similarity is irrelevant" when there has been

-61-

direct evidence of copying. *Range Road Music, Inc. v. East Coast Foods, Inc.*, 668

F.3d 1148, 1154 (9th Cir. 2012) (quotation omitted); *accord Norse v. Henry Holt*

*and Co.*, 991 F.2d 563 (9th Cir. 1993) (same); *Enter. Mgmt. Ltd. v. Warrick*, 717

F.3d 1112, 1120 (10th Cir. 2013) (upon "direct evidence of copying," a plaintiff

"need not show copying indirectly by the usual method of demonstrating access

and substantial similarity."). The Fourth Circuit elaborated:

> 'Direct evidence of copying … includes evidence such as
> party admissions, witness accounts of the physical act of
> copying, and common errors in the works of plaintiffs and
> the defendants.' *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d
> 726, 732 (8th Cir. 2006). … [O]ur sister circuits have found
> direct evidence of copying where a defendant 'gave …
> explicit instruction that [a] work be copied,' *Rogers v.*
> *Koons*, 960 F.2d 301, 307 (2d Cir. 1992), and where the
> defendant admitted to copying the plaintiff's work, *see, e.g.*,
> *Enter. Mgmt. Ltd. v. Warrick*, 717 F.3d 1112, 1120 (10th
> Cir. 2013); *Soc'y of Holy Transfiguration Monastery, Inc. v.*
> *Gregory*, 689 F.3d 29, 49 (1st Cir. 2012).

*Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 537

(4th Cir. 2015).

In the oft-cited *Rogers* case, the Second Circuit affirmed summary judgment

for the plaintiff based on direct proof: the defendant gave a copy of the plaintiff's

photograph to Italian sculpture artisans and instructed them to copy protectable

elements—including "the poses" of the figures. 960 F.2d at 307. Similarly, where

a copyright defendant's clothing designer had "purchased both the [plaintiff's]

sweaters and sent them to an overseas manufacturer for use as models," the First

-62-

Circuit highlighted this "direct evidence" in affirming summary judgment for the plaintiff. *Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56, 61-62 (1st Cir. 2000). Similarly, in *L.A. Printex*, this Court explained that the plaintiff had to demonstrate access and substantial similarity only because the plaintiff "offered no direct evidence that Defendants copied [the copyrighted work]." 676 F.3d at 846.

Given the strength of Mr. Rentmeester's allegations, and the beneficial inferences to which he is entitled, the district court should have concluded that Mr. Rentmeester adequately alleged direct evidence of copying. At the very least, Mr. Rentmeester's allegations "raise a reasonable expectation that discovery will reveal" direct evidence of copying. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007).

Indeed, a contemporaneous publication confirms that Mr. Moore was physically present when the Nike Photo was taken. Harvey Decl., Ex. 8. After Mr. Rentmeester complained to Nike about the infringing Nike Photo, Nike agreed to a second limited license, effectively conceding that the Nike Photo was an unauthorized derivative work. 2-ER-78, 94. Why else would Nike have agreed to the second license, except on the understanding that it had copied protected expression from the Rentmeester Photo? Dismissal is entirely unwarranted where Nike's contemporaneous response to Mr. Rentmeester's complaints of its copying was to submit to a license rather than defend its conduct: "the absence of any

-63-

countervailing evidence of creation independent of the copyrighted source may well render clearly erroneous a finding that there was not copying." *Steinberg v. Columbia Pictures Indus.*, 663 F. Supp. 706, 714 (S.D.N.Y. 1987) (quoting *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970) (internal quotations omitted).

Mr. Jordan confirmed years later that the pose in the Nike Photo and the Jumpman Logo was the same pose Mr. Rentmeester directed and expressed that day in Chapel Hill, North Carolina: "It's like my logo. I wasn't even dunking on that one. People think that I was. I just stood on the floor, jumped up and spread my legs and they took the picture. I wasn't even running. Everyone thought I did that by running and taking off. Actually, it was a ballet move where I jumped up and spread my legs. And I was holding the ball in my left hand." 2-ER-80.

Mr. Jordan's own autobiography contains an admission by Nike that the Nike Photo and Jumpman Logo were copied from the Rentmeester Photo. Harvey Decl., Ex. 7. Tinker Hatfield took over from Mr. Moore at Nike, and is Nike's current Vice President for Design and Special Projects. *Id*. Mr. Jordan's autobiography credits Mr. Hatfield with the following explanation: "One of the things that Peter [Moore] left behind in his stack of sketches was the Jumpman. *Someone outside Nike* [Mr. Rentmeester] had taken a photograph of Michael doing his spread-eagle dunk [the Rentmeester Photo]. *Peter had a poster made of that*

-64-

*shot* with Michael in Air Jordan apparel. *He traced the shot*, modified it a little bit and created the Jumpman logo." *Id*. at p. 59 (emphasis added).

Second, even if a substantial similarity analysis is necessary to advance beyond the pleadings, Mr. Rentmeester's allegations of access are certainly *relevant* to the level of similarity that Mr. Rentmeester must prove. The district court overlooked the long line of Ninth Circuit cases holding that access and substantial similarity are not wholly distinct prongs for assessing indirect evidence of copying, but instead represent two sides of the same coin. *See*, *e.g*., *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010) ("Under the 'inverse ratio' rule, if a defendant had access to a copyrighted work, the plaintiff may show infringement based on a lesser degree of similarity between the copyrighted work and the allegedly infringing work."); *Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004) (reversing grant of summary judgment to copyright defendants and explaining that "[w]here a high degree of access is shown, we require a lower standard of proof of substantial similarity."); *Three Boys Music*, 212 F.3d at 485 (repeating the rule); *Shaw v. Lindheim*, 919 F.2d 1353, 1361-62 (9th Cir. 1990) (rejecting challenge to the rule because it "is the law of this circuit.").

For example, in *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002), this Court reversed a grant of summary judgment to the alleged infringer, finding that the plaintiff writers' case was "strengthened considerably by [a defendant's]

-65-

concession of access to their works." *Id*. at 1075. The Court explained that "[i]f the trier of fact were to believe" that defendants "actually read the scripts … it could easily infer that the many similarities … were the result of copying, not mere coincidence." *Id*.

The evidence of access here is even stronger. As the district court acknowledged at oral argument, it is "not at issue that there was access in this case. That's a given part of the record." 2-ER-21:24-25. Nike argued that its prior access to the Rentmeester Photo should play no part in the substantial similarity analysis because Nike conceded it. 2-ER-119. But Nike cannot make a bad fact irrelevant by admitting it is true. Under the settled law of this Court, Nike's prior access to the Rentmeester Photo should have yielded a *relaxed* version of the substantial similarity test. Instead, the district court applied a *heightened* version, committing legal error.

## V.   THE DISMISSAL OF MR. RENTMEESTER'S CLAIM UNDER THE DIGITAL MILLENIUM COPYRIGHT ACT SHOULD BE REVERSED

The district court based its dismissal of Mr. Rentmeester's DMCA claim solely upon its finding that no copyright infringement occurred. 1-ER-13. Because that finding is erroneous for the reasons set forth above, the dismissal of the DMCA claim should be reversed.

-66-

## VI.   THE DISTRICT COURT ERRED IN DISMISSING MR. RENTMEESTER'S COMPLAINT WITHOUT LEAVE TO AMEND

A strong policy favors permitting complaint amendments, and "[t]his policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quotation omitted).

Nike moved to dismiss Mr. Rentmeester's first and only complaint. 2-ER-103-152. Nonetheless, the district court granted Nike's motion to dismiss with prejudice, while discovery was in its early stages, before the parties (and third parties, such as Mr. Moore) completed producing documents, before any depositions, and before any expert disclosures. 1-ER-14-15, 1062. The parties had no opportunity to present evidence or expert analysis. 6-ER-1062. Mr. Rentmeester had no opportunity to amend his complaint to reflect the limited discovery that had taken place, or to react to the "*Mattel* Test" as articulated by the district court (a test no party advanced and no party briefed).

Mr. Rentmeester asked for an opportunity to amend his complaint in the event the district court granted Nike's motion. 4-ER-627-28. The district court offered no reason for dismissing Mr. Rentmeester's claims with prejudice, and erred in doing so. *Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Indus. of So. Cal.*, 648 F.2d 1252, 1254 (9th Cir. 1981).

## CONCLUSION

The correct analysis here is straightforward. To state a claim for copyright infringement, Mr. Rentmeester must allege that he owns the copyright in the Rentmeester Photo and that Nike copied protected elements of the work. *Cavalier*, 297 F.3d at 822. There is no dispute that Mr. Rentmeester owns a valid copyright in the Rentmeester Photo. 2-ER-76, 119. Mr. Rentmeester alleges sufficient facts to, at the very least, raise a reasonable expectation that discovery will reveal direct evidence of Nike's copying. 2-ER-76-79; *Twombly*, 550 U.S. at 556. Nike's motion to dismiss should have been denied on this basis alone. *Range Road Music*, 668 F.3d at 1154.

If application of the extrinsic test is necessary to advance beyond the pleadings, Mr. Rentmeester may demonstrate infringement by meeting "a lower standard of proof of substantial similarity," *Swirsky*, 376 F.3d at 844, in light of Mr. Rentmeester's compelling allegations regarding Nike's copying and prior access, 2-ER-76-79. The relevant standard of comparison cannot exceed "substantial similarity" for the additional reason that the Rentmeester Photo is an original work of visual art, and its visual elements result from creative choices made from a wide range of possible expression. 2-ER-73-75; *McCulloch*, 823 F.2d at 321.

A comparison of the "objective details in appearance," *Cavalier*, 297 F.3d at 826, confirms substantial similarities between the Rentmeester Photo and Nike's derivative works: the same subject, the same pose, the same silhouette, the subject captured at the same moment, the same location and background, viewed from the same perspective and location, the same depth of field, and the same placement and arrangement of visual elements. Part III, *supra*. These substantial similarities more than satisfy the extrinsic test, regardless of whether the works differ in other respects. *L.A. Printex*, 676 F.3d at 851. A comparison under the intrinsic test is reserved for the jury at trial. *Id.* at 852.

Thus Mr. Rentmeester has stated a claim for copyright infringement. The district court's contrary conclusion was erroneous and should be reversed.

Respectfully submitted,

Dated: September 28, 2015          */s/ Dean M. Harvey*
                                                    Dean M. Harvey


Eric B. Fastiff
Dean M. Harvey
Katherine C. Lubin
LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP


Cody Hoesly
LARKIN VACURA LLP

*Counsel for Plaintiff-Appellant*

-69-

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App.

P. 32(a)(7)(B), because it contains 13,879 words, as determined by Microsoft

Word 2007, including the headings and footnotes and excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  The brief also complies with

the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style

requirements of Fed. R. App. P. 32(a)(6).  The text appears in 14-point Times New

Roman, a proportionally spaced serif typeface.


Dated:  September 28, 2015          */s/ Dean M. Harvey*
                                      Dean M. Harvey


                                    *Counsel for Plaintiff-Appellant*

## <u>STATEMENT OF RELATED CASES</u>

Appellant is aware of no cases to disclose pursuant to Ninth Circuit Rule 28–

2.6.

Dated:  September 28, 2015

/s/ Dean M. Harvey
Dean M. Harvey

*Counsel for Plaintiff-Appellant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 28th, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit, via the appellate CM/ECF system. Case participants who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: September 28, 2015      */s/ Dean M. Harvey*
                               Dean M. Harvey

                          *Counsel for Plaintiff-Appellant*